IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BAKO PATHOLOGY LP, BPA HOLDING CORP., and BAKO PATHOLOGY ASSOCIATES, LLC, | § § § § | No. 382, 2021 |
| | § | |
| Defendants Below, | § | |
| Appellants/Cross-Appellees, | § | Court Below—Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | C.A. No. N17C-12-337 |
| BRADLEY BAKOTIC and | § | |
| JOSEPH HACKEL, | § | |
| | § | |
| Plaintiffs Below, | § | |
| Appellees/Cross-Appellants | § | |

Submitted: September 21, 2022
Decided: November 28, 2022

Before **VALIHURA**, **VAUGHN**, and **TRAYNOR**, Justices.

Upon appeal from the Superior Court. **AFFIRMED** in part, **REVERSED** in part, and **REMANDED**.

Mary F. Dugan, Esquire, Lauren E.M. Russell, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware. Of counsel: Robert W. Capobianco, Esquire (*argued*), Adriana R. Midence, Esquire, Kelli N. Church, Esquire, Jackson Lewis P.C., Atlanta, Georgia, for Appellants.

Bruce W. McCullough, Esquire, Bodell Bove, LLC, Wilmington, Delaware. Of counsel: Salmeh K. Fodor, Esquire, Kristoffer V. Sargent, Esquire (*argued*), KF Law, LLC, Atlanta, Georgia, for Appellees.

**VALIHURA**, Justice:

*INTRODUCTION*

This is an appeal in a protracted contractual battle between two sides that dispute the meaning and application of certain restrictive covenants. Since the filing of the action in the Superior Court in December 2017, the parties proceeded through Rule 12 motions, then discovery and summary judgment motions, and, ultimately, a seven-day bench trial.

The Superior Court held that Plaintiffs Below, Appellees/Cross-Appellants, two doctors who started a laboratory testing enterprise known as Bako Diagnostics ("Bako"), breached certain restrictive covenants when they left Bako to form a new, competing laboratory enterprise. Despite fee-shifting provisions in certain of the contracts, the trial court declined to award attorneys' fees.

We agree with the Superior Court's determinations that the two doctors breached certain of the restrictive covenants. But because it appears that the Superior Court may have misapplied the formula that both sides employed for calculating damages, we remand for the court to clarify how it derived its damages award and for any needed revisions. Further, we disagree that no attorneys' fees were warranted under certain of the contracts. Accordingly, we AFFIRM in part, REVERSE in part, and REMAND for further proceedings consistent with this Opinion.

## I. RELEVANT FACTS AND PROCEDURAL BACKGROUND[1]

### A. *The Parties*

Defendant Below, Appellant/Cross-Appellee Bako Pathology LP ("Bako LP") is a Delaware limited partnership. Defendant Below, Appellant/Cross-Appellee BPA Holding Corp. ("BPA Holding") is a Delaware corporation. Bako LP owns BPA Holding. Defendant Below, Appellant/Cross-Appellee Bakotic Pathology Associates, LLC ("Bakotic Associates") is a limited liability company formed under the laws of the State of Georgia.[2] BPA Holding is the sole member of Bakotic Associates.

Plaintiff Below, Appellee/Cross-Appellant Dr. Bradley Bakotic, D.P.M., D.O. ("Dr. Bakotic") "is a licensed doctor of podiatric medicine and osteopathic medicine."[3] Dr. Bakotic served as the CEO of Bakotic Associates until September 2017.

Plaintiff Below, Appellee/Cross-Appellant Dr. Joseph Hackel, M.D. ("Dr. Hackel" and together with Dr. Bakotic, the "Doctors")[4] "is a licensed medical doctor"[5] who worked

---

[1] The facts, except as otherwise noted, are taken from the post-trial opinion below, *Bakotic & Hackel v. Bako Pathology LP, et al.*, C.A. No. N17C-12-337 WCC (Nov. 2, 2021) [hereinafter, the *Opinion*].

[2] A232 (Compl. ¶ 10). Bakotic Associates has also been referred to in the trial court proceedings as "Bako Diagnostics" or "Bako." B21 (Pretrial Stipulation and Proposed Order at 5). We use the term "Bako" to refer to the physical laboratory that "provid[es] clinical pathology, anatomic pathology, and dermatopathology-related services" out of its principal place of business in Alpharetta, Georgia. *Id.* Bakotic Associates, as used herein, refers to the same entity's legal name.

We also note that Appellants incorrectly identified Bakotic Pathology Associates, LLC as "Bako Pathology Associates, LLC" in the captions of their briefs filed with this Court.

[3] *Opinion*, at 2.

[4] The Doctors raise five contentions on cross-appeal. For ease of reference, this Opinion refers to them as the Doctors and to Bako LP, BPA Holding, and Bakotic Associates collectively as the "Appellants."

[5] *Opinion*, at 2.

as Bako's Medical Director and as a practicing dermatopathologist.

*B. The Doctors Establish Bako*

The Doctors first met in 2000 and, over time, worked together at various pathology laboratories. In 2007, the two decided to start their own pathology laboratory enterprise and founded Bako in Alpharetta, Georgia. Bako is a dermatopathology laboratory that offers four main lab services: (1) dermatopathology; (2) microbiology testing; (3) molecular testing; and (4) epidermal nerve fiber density testing. In addition, the lab sells specialized creams and solutions to medical practitioners, namely podiatrists and some dermatologists throughout the United States.

While at Bako, Dr. Bakotic implemented several testing methods. As part of the testing panel offered by the lab, Dr. Bakotic encouraged the use of Period Acid Schiff ("PAS") and GMS histochemical genetic tests. Both the PAS and GMS testing soon became lucrative aspects of the lab's business and were touted by Dr. Bakotic, in communications with potential clients, as tests with "ultrahigh sensitivity with the fewest false negative results."[6] In addition to the PAS and GMS testing, Bako developed PCR testing as a faster alternative to other testing options. Bako's PCR testing was the only service of its type offered in the field and became a critical component of the lab's business model.

Bako's laboratory enterprise soon attracted the attention of other entities in the medical arena. In January 2014, Bako and the Ankle and Foot Centers of Georgia

---

[6] *Opinion*, at 5.

("AFCG") entered into a Medical Director Services Agreement (the "AFCG Agreement"), whereby Dr. Bakotic would serve as the Medical Director of AFCG. The AFCG Agreement provides that Bako could replace Dr. Bakotic and select a new Medical Director for AFCG.[7]

To augment the lab's testing services, Bako developed a highly successful marketing strategy. The lab sponsored various conferences hosted by various podiatry associations, which allowed Dr. Bakotic to lecture at conferences and to strengthen the lab's brand, goodwill, and client base in the process. The lab obtained "booth space" at these conferences and staffed them with sales representatives who marketed Bako's laboratory services to the conference attendees.

Dr. Bakotic proved to be the driving force behind Bako's successful marketing strategy. The lab "sponsored, produced, or provided over 200 lectures, seminars[,] and small group meetings with podiatrists throughout the year."[8] Dr. Bakotic himself decided which conferences the lab would sponsor based upon how much business he felt the conferences could generate. Due to his visibility at the conferences — in particular, his educational lectures — Dr. Bakotic became known as "the face of Bako" and a leader in the podiatric community.

---

[7] A561 (Dr. Bakotic Trial Test. at 216:7–19). Dr. Bakotic, however, remained the Medical Director of AFCG even after his eventual termination from Bako. *See Opinion*, at 5; *infra* section I.D.

[8] *Opinion*, at 4 (internal quotations and citation omitted).

*C. The Restrictive Covenants*

Following Bako's founding in 2007, the lab became quite successful.  Starting in the fall of 2011, the Doctors executed three contracts, each of which contains restrictive covenants.

*1.    The Employment Agreements*

In 2011, the Doctors sold a percentage of Bakotic Associates to Ampersand 2011 Limited Partnership.  As part of that transaction, they entered into separate employment agreements with BPA Holding, on behalf of its subsidiary, Bakotic Associates.[9]  The Bakotic Employment Agreement and the Hackel Employment Agreement (collectively, the "Employment Agreements") became effective as of November 18, 2011.

The Employment Agreements contain several, nearly identical restrictive covenants binding on the Doctors.  For example, the Employment Agreements contain non-competition provisions (the "Employment Non-Compete Provisions") that provide:

1. **NON-COMPETITION.**  While Employee is engaged by the Company, Employee agrees that during the term of Employee's employment by the Company, other than in the proper performance of Employee's employment duties for the Company, and *for a period of twenty-four (24) months after such employment terminates* for any reason (other than without cause termination by the Company), Employee *shall not perform the same or similar duties that he or she performed for the Company on behalf of or for the benefit of (i) any laboratory and/or health care provider which competes with the Company, or (ii) any customer or client of the Company for whom the Company provided services within two years prior to Employee's termination from the Company*.  The restriction

---

[9] A93 (the "Bakotic Employment Agreement"); A101 (the "Hackel Employment Agreement"). The parties to these agreements include "BPA Holding Corp., on behalf of itself and its wholly-owned subsidiary, Bakotic Pathology Associates, LLC (collectively, 'Company')" and then either Dr. Bakotic or Dr. Hackel, respectively.  *See id.*

6

herein is limited to the territory where the Company was doing business at the time of the transaction.[10]

The Employment Agreements also contain several provisions regarding the use of proprietary information. Both contain non-use provisions (the "Employment Non-Use Provisions") that provide:

2. **NON-DISCLOSURE AND NON-USE OF PROPRIETARY INFORMATION.**
   a. **Maintaining the Company's Proprietary Information.** Employee agrees not to use, utilize, disclose, or reverse engineer the Company's Confidential Information or Trade Secrets for any purpose other than the Company's business, except as authorized in writing by the Company. The covenants made by the Employee herein are in addition to, and not exclusive of, any and all other rights to which the Company is entitled under federal and state law, including, but not limited to, rights provided under copyright and trade secret laws, and laws concerning fiduciary duties. Employee's obligations under this Paragraph 2.a shall remain in effect as long as the information constitutes a Trade Secret under applicable law and/or Confidential Information, as defined above.[11]

The Bakotic Employment Agreement contains an additional provision (the "Employment Existing Use Provision"), which provides:

2. **NON-DISCLOSURE AND NON-USE OF PROPRIETARY INFORMATION.**
   d. **Existing Materials and Perpetual License.** Notwithstanding anything herein to the contrary, the parties hereto, hereby acknowledge and agree that Employee is the sole owner of those items identified on Exhibit A, attached hereto and incorporated herein by reference (collectively, the "Employee Information"), and as a result, such Employee Information is not considered to be Company Proprietary

---

[10] A93 (Bakotic Employment Agreement § 1) (emphases added); A101 (Hackel Employment Agreement § 1) (emphases added).

[11] A94 (Bakotic Employment Agreement § 2(a)); A102–03 (Hackel Employment Agreement § 2(a)).

Information. Moreover, the parties hereto hereby acknowledge and agree that, upon termination of Employee's employment with the Company for any reason, Employee shall have a non-exclusive, perpetual license to use, for educational purposes, any and all information of the same general type as the Employee Information developed by Employee during the term of his employment by the Company.[12]

Dr. Bakotic testified at trial that he understood the Employment Existing Use Provision to be an "education carveout[.]"[13] The Hackel Employment Agreement does not contain an Employment Existing Use Provision.

In addition to the above restrictive covenants, the Employment Agreements contain fee-shifting provisions for attorneys' fees (the "Employment Fee-Shifting Provisions") that provide:

> 8. **ATTORNEYS' FEES** If Company is the *prevailing party* in any legal proceeding to construe, apply, interpret, enforce or defend any of Company's rights *in this Agreement*, Employee agrees to reimburse Company for all reasonable costs, expenses and attorney's fees incurred by Company in such proceedings.[14]

### 2. The Merger Agreement

On December 3, 2015, the Doctors entered into an Agreement and Plan of Merger (the "Merger Agreement") with various corporate entities. The corporate signatories to the Merger Agreement include: Bako Pathology Holdings Corp. (as the buyer); Bako LP; BPA Merger Corp. (as the buyer's subsidiary); BPA Holding (defined as the "Company" in the

---

[12] A95 (Bakotic Employment Agreement § 2(d)).

[13] A573 (Dr. Bakotic Trial Test. at 265:5–19).

[14] A97 (Bakotic Employment Agreement § 8) (emphases added); A105 (Hackel Employment Agreement § 8) (emphases added).

Merger Agreement); Ampersand 2011 Limited Partnership (as the securityholder representative); and various individuals, including the Doctors.[15]

Like the Employment Agreements, the Merger Agreement contains a non-competition provision (the "Merger Non-Compete Provision"), which provides:

> 5.11  Non-Competition; Non-Solicitation.  (a)  Each of Bradley W. Bakotic [and] Joseph Hackel . . . agree that, from the Closing Date until the date that is *five (5) years following* the Closing Date, he . . . shall not . . . without the prior written consent of Buyer[:]
>
> (ii)(A)  *engage in the Competing Business in any manner or capacity* (whether as an officer, director, employee, consultant, owner, investor or otherwise with respect to any Competing Business), (B) own any equity interest, or operate, control or participate (including as a joint venture partner, agent, representative, consultant or lender) in any Person that engages directly or indirectly in the Competing Business, (C) solicit any direct or indirect investors, agents, providers/suppliers, distributors or other similar parties of the Company or any of its Subsidiaries, in each case, in respect of a Competing Business or (D) intentionally interfere with the business relationships between the Company or any of its Subsidiaries and any of its investors.
>
> For purposes of this Agreement, "Competing Business" means any business in which the Company or any of its Subsidiaries is engaged, or has specific plans (as evidenced by documentation of the Company) to become engaged, in each case, as of the Closing Date.
>
> Notwithstanding the foregoing, nothing contained in this Agreement shall restrict any of the individuals identified above in Section 5.11(a) from being employed by a Competing Business (i) if such individual's role with such Competing Business is limited to a business unit or division that would not reasonably be expected to be competitive with any business in which the Company or any of its Subsidiaries is engaged, or has specific plans to become engaged, in each case, as of the Closing Date[.][16]

---

[15] A114 (Merger Agreement Recital).

[16] A163–64 (Merger Agreement § 5.11(a)(ii)) (emphases added).

9

The Merger Agreement also contains a non-solicitation provision (the "Merger Non-Solicitation Provision"), which provides:

> 5.11 <u>Non-Competition; Non-Solicitation</u>. (a) Each of Bradley W. Bakotic [and] Joseph Hackel . . . agree that, from the Closing Date until the date that is *five (5) years following* the Closing Date, he . . . shall not . . . without the prior written consent of Buyer[:]
>
> (i)(A) hire or solicit for employment any employee of the Company or any of its Subsidiaries or any Person who has been an employee of the Company or any of its Subsidiaries in the preceding twelve (12) months, except for any employee of the Company or any of its Subsidiaries who, following the Closing, has been involuntarily terminated by the Company or Buyer for a six (6)-month period prior to commencement of employment with such Person or (B) induce or encourage any employee of an [*sic*] the Company or any of its Subsidiaries to no longer be employed by the Company or any of its Subsidiaries[.][17]

Unlike the Employment Agreements, the Merger Agreement does not contain a fee-shifting clause.

### 3. The Partnership Agreement

On January 7, 2016, just over a month after the Merger Agreement's execution, the Doctors — in their capacity as limited partners of Bako LP — entered into an Amended and Restated Limited Partnership Agreement of Bako Pathology LP (the "Partnership Agreement") with Bako LP, Bako Pathology GP LLC, and various other limited partners.[18] Dr. Bakotic's capital contribution to Bako LP was $16,967,000,[19] and Dr. Hackel's was

---

[17] A163 (Merger Agreement § 5.11(a)(i)) (emphasis added).

[18] *Opinion*, at 9. The Partnership Agreement was formed pursuant to the Revised Uniform Limited Partnership Act of the State of Delaware. *See* B61 (Partnership Agreement Recital); B63 (Partnership Agreement § 2.2).

[19] B126 (Partnership Agreement Exhibit A).

$6,556,000.[20]  This translated to an ownership interest in Bako LP of "approximately 11.6% [for Dr. Bakotic] and 3.4% [for Dr. Hackel]."[21]

Like the Employment Agreements and the Merger Agreement, the Partnership Agreement contains a non-competition provision (the "Partnership Non-Compete Provision"), which provides:

> 6.5.  Competitive Opportunity.  6.5.1 None of the Limited Partners nor any of their respective Affiliates or Affiliated Funds shall have any business interests or engage in business activities in addition to those relating to the Partnership, including, without limitation, business interests and activities in direct competition with the Partnership or any of its Subsidiaries[.][22]

In addition to the Partnership Non-Compete Provision, the Partnership Agreement — like the Employment Agreements but unlike the Merger Agreement — contains a fee-shifting provision for attorneys' fees (the "Partnership Fee-Shifting Provision"), which provides:

> 12.12.  Attorneys' Fees.  If any dispute between the parties hereto should result in litigation or arbitration, the *prevailing party in such dispute* shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorneys' fees and expenses, all of which shall be deemed to have accrued upon the commencement of such action and shall be paid whether or not such action is prosecuted to judgment.  Any judgment or order entered in such action shall contain a specific provision providing for the recovery of attorneys' fees and costs incurred in enforcing such judgment and an award of prejudgment interest from the date of the breach at the maxim rate of interest allowed by law.  For the purposes of this Section 12.12: (a) attorneys' fees shall include, without limitation, fees incurred in the following: (i) post-judgment motions; (ii) contempt proceedings; (iii) garnishment, levy and debtor and third party examinations; (iv) discovery

---

[20] B127 (Partnership Agreement Exhibit A).

[21] A259 (Def. Ans. & Counterclaims ¶ 14).

[22] B89 (Partnership Agreement § 6.5.1).

11

and (v) bankruptcy litigation and (b) "*prevailing party*" means *the party who is determined in the proceeding to have prevailed or who prevails by dismissal, default or otherwise*.[23]

D. *The Doctors Leave Bako and Form the Rhett Foundation*

On September 7, 2017, Dr. Bakotic was terminated as CEO of Bakotic Associates.[24] Roughly three weeks later, on September 30, 2017, Dr. Hackel informed Bakotic Associates that he planned on retiring.[25] He resigned following Dr. Bakotic's termination. At trial, Dr. Hackel testified that he "didn't want to work there if [Dr. Bakotic] was no longer there" but that Dr. Bakotic did not encourage his resignation.[26]

A few days later, on October 3, 2017, the Doctors founded the Rhett Foundation (the "Foundation") and donated $2.2 million to it. The Doctors both served on the Foundation's board of directors, with Dr. Bakotic as chairman.[27] Several of the Foundation's contributing founders previously gave lectures on behalf of Bako.

But with the Doctors gone, Bako needed a new Medical Director. On September 25, 2017, Bako entered into a contract with Dr. Bryan Markinson for the position of Medical Director (the "Bako-Markinson Agreement"). A few days later, Dr. Markinson shared the contract with Dr. Bakotic, and they discussed the potential implications the Bako-Markinson Agreement would have on Dr. Markinson joining the Foundation. Dr. Bakotic informed Dr. Markinson that, despite Bako's representations, Dr. Bakotic could

---

[23] B113-14 (Partnership Agreement § 12.12) (emphases added).

[24] *Opinion*, at 9.

[25] A590 (Dr. Hackel Trial Test. at 50:11–16).

[26] A597 (Dr. Hackel Trial Test. at 77:22–78:4).

[27] A531 (Dr. Bakotic Trial Test. at 97:2–9).

12

not return to Bako. Shortly after Dr. Bakotic's conversation with Dr. Markinson, Dr. Markinson rescinded the Bako-Markinson Agreement on October 1, 2017.[28]

Following the Foundation's formation, Dr. Bakotic made a post about it on his personal Facebook page. In his post, Dr. Bakotic wrote that the Foundation was his and Dr. Hackel's "second chapter" and that they would "sponsor various educational events and institutions as we always have[.]"[29] Consistent with his post, the Foundation "sponsored twenty podiatric conferences and provided a speaker at thirty-five other podiatry events."[30] Dr. Bakotic himself gave some of these lectures, including one on November 22, 2017, during which he informed a room of podiatrists that the allegations underlying his internal investigation at Bako had been found to be unsupported.

On December 28, 2017, the Doctors formed Rhett Diagnostics, LLC ("Rhett Diagnostics"), which "was intended to be a human anatomic pathology laboratory."[31] To staff it, the Doctors "hired several employees to work for Rhett Diagnostics, including several who were previously Bako employees, and purchased human pathology laboratory equipment costing between $600,000 and $700,000."[32] Despite those efforts, the lab never became operational.

---

[28] *Opinion*, at 10. Dr. Markinson would go on to serve on the Foundation's board and as a founding member. *See id.* at 10–11.

[29] A532 (Dr. Bakotic Trial Test. at 100:13–101:8).

[30] *Opinion*, at 11.

[31] *Opinion* at 14.

[32] *Id*.

As time passed, Dr. Bakotic continued to emphasize that the Foundation's purpose mirrored that of Bako's. In an article posted on June 21, 2018, to a website he created, Dr. Bakotic stated that his departure from Bako was "voluntar[y]" and that, through the Foundation, he and Dr. Hackel "intend to continue doing what [they have] done throughout [their] entire professional careers: support the advancement of the podiatric profession[.]"[33]

### E. Proceedings in the Superior Court and the Court of Chancery

On December 27, 2017, the Doctors filed their complaint in the Superior Court against the Appellants. They sought a declaratory judgment that the restrictive covenants — the Employment Non-Compete Provisions and the Partnership Non-Compete Provision — were invalid under 6 *Del. C.* § 2707 ("Section 2707").[34] Appellants answered and filed counterclaims on February 12, 2018. Appellants sought a declaratory judgment that the restrictive covenants were valid under Delaware law. In addition, they asserted breach of contract, breach of the duty of loyalty, unjust enrichment, and tortious interference counterclaims against both Doctors and a claim for slander against Dr. Bakotic.[35]

Appellants subsequently moved for a preliminary injunction in the Court of Chancery in July 2018. In the meantime, Dr. Bakotic informed a fellow podiatrist, Dr. David Tarr, that Appellants had sought an injunction against the Doctors. In response, Dr. Tarr drafted what became known as the "Tarr Petition," which stated that the undersigned Dr. Tarr planned to call Bako and:

---

[33] *Id.* at 12 (internal quotations omitted).

[34] A235 (Compl. ¶ 29).

[35] *Opinion*, at 14; A270–76 (Def. Ans. & Counterclaims ¶¶ 64–107).

14

[G]ive them 30 days' notice to cease and desist from their attempts to prevent Dr. Bakotic from speaking and sponsor activities, all of which benefit our collective profession. Should they not reverse course, I will entrust my business to a lab that has not chosen to put profits above benevolence, and I hope you will consider doing the same.[36]

Dr. Bakotic helped Dr. Tarr disseminate the Tarr Petition by connecting him "with public relations professionals who worked for the Rhett Foundation to facilitate the circulation of [the Tarr Petition]."[37]

The Court of Chancery entered a Status Quo Order on September 6, 2018, that enjoined the Doctors from:

a. Engaging in any speaking or sponsorship activities at any podiatry or dermatology conferences, or at any educational institutions at which podiatrists or dermatologists are anticipated to be in attendance . . . b. Administering a fellowship or similar internship program for podiatry students . . . c. Interfering with any sponsorship and speaking activities of Bako Diagnostics at podiatry or dermatology conferences, associations, and educational intuitions; and d. Owning, operating, or having any interest in or with any laboratory engaged in the provision of anatomic and molecular pathology services, microbiology services, and neuropathy-related testing to podiatrists and dermatologists.[38]

While the parties engaged in the initial stages of litigation, the Doctors continued to communicate with the podiatric and dermatology communities. In November and December of 2018, Dr. Bakotic contacted approximately 50 members of the podiatric

---

[36] A302 (Tarr Petition).

[37] *Opinion*, at 16.

[38] C1–2 (Court of Chancery Status Quo and Scheduling Order). The Court of Chancery withdrew the Status Quo Order on March 20, 2019, pending resolution of the claims in the Superior Court. *See Opinion*, at 15 n.78.

community to sign and return affidavits for use against Appellants.[39] Dr. Bakotic's emails were sent "on behalf of the Rhett Foundation[.]"[40]

The Doctors moved for judgment on the pleadings under Superior Court Civil Rule 12(c). On December 10, 2018, the Superior Court denied the Doctors' motion for a declaratory judgment on the restrictive covenants, the breach of contract counterclaim, and the tortious interference counterclaim against Dr. Bakotic.[41] The Superior Court dismissed the breach of the duty of loyalty counterclaim, the unjust enrichment counterclaim, the slander counterclaim against Dr. Bakotic, and the tortious interference counterclaim against Dr. Hackel.[42]

Both sides later moved for summary judgment under Superior Court Civil Rule 56. In their brief for summary judgment, the Doctors argued for the first time that neither of the then-defendants (Bako LP and BPA Holding) had standing to pursue the breach of contract claims.[43] The parties stipulated to adding Bakotic Associates as a third defendant to address any standing concerns, noting that such "stipulation shall not act as a waiver of any party's claims or defenses[.]"[44]

On December 11, 2019, the Superior Court denied the Doctors' motion for summary

---

[39] A554 (Dr. Bakotic Trial Test. at 188:7–15).

[40] A555 (Dr. Bakotic Trial Test. at 195:14–16).

[41] *See Bakotic v. Bako Pathology LP*, 2018 WL 6601172, at *3, *4, *6 (Del. Super. Dec. 10, 2018).

[42] *See id.* at *4–7.

[43] B156–59 (Plaintiff's Op. Br. for Summary Judgment at 21–24). As of the time the Doctors filed their brief for summary judgment, the defendants in the action were Bako LP and BPA Holding.

[44] C151 (Stipulation to Add Party ¶ 3).

judgment and granted Appellants' motion for partial summary judgment with respect to the parties' Section 2707 arguments, finding that the statute "cannot be used to invalidate [the Doctors'] non-competition agreements because the statute does not apply."[45]

The Superior Court conducted a seven-day bench trial in January 2021. On the breach of contract claims, the Superior Court found that the Doctors breached the following: the Employment Non-Compete Provisions, the Employment Non-Use Provisions, the Partnership Non-Compete Provision, and the Merger Non-Solicitation Provision. The court found that the Doctors did not breach the Merger Non-Compete Provision and that Dr. Bakotic did not tortiously interfere with Bakotic Associates' contracts.

Regarding the breach of contract claims, Appellants' damages expert opined that Bako suffered lost profits of $8,273,121 from January 2018 to February 2019 and a loss in business value of $65,980,243 as of March 2019, for total damages of $74,253,364.[46] Appellants' expert applied "a growth rate of 9.4 percent and 8.9 percent" to calculate lost profits, but the court found the growth rate to be "unrealistic" and declined to apply it, saying that it caused the projected damages "figure to be inflated and unreliable."[47] Instead, the court accepted the "expert['s] opinion that some growth did occur" and "decided to

[45] *Bakotic v. Bako Pathology LP*, 2019 WL 6896465, at *5 (Del. Super. Dec. 11, 2019) [hereinafter *Bako Pathology*, 2019 WL 6896465, at _].

[46] A381 (Mark J. Hosfield Expert Report at 34).

[47] *Opinion*, at 47–48.

apply a growth rate of 1.5%[.]"[48] The trial court then awarded damages totaling $1,740,254 to Appellants.

In addition to damages, both sides moved for attorneys' fees. Appellants asserted that their fees and costs totaled approximately $2.3 million, while the Doctors asserted their fees and costs totaled $1,689,395. The court declined to award either side fees, despite the fee-shifting clauses in the underlying contracts at issue. In analyzing the contract language on fee shifting, the trial court found that neither side was the "prevailing party" in the litigation and, thus, no fees would be shifted.[49]

## F. Contentions on Appeal and Cross-Appeal

Appellants raise two issues on appeal. First, Appellants contend that the Superior Court abused its discretion by applying — without explaining how it derived — its own growth rate. Second, Appellants assert that the Superior Court abused its discretion by not awarding attorneys' fees despite the fee-shifting provisions in certain of the contracts.

The Doctors raise five issues on cross-appeal. First, they contend that the Superior Court erred in finding Section 2707 to be inapplicable. Second, they assert that the

---

[48] *Id.* at 49.

[49] At trial, the court stated that the parties could present evidence regarding the reasonableness and amounts of their attorneys' fees at a later time if it became necessary. *See* A839 (Trial Tr. at 32:10–12) ("I'll accept [the attorneys' fees amounts] as submitted. And if I award fees, if I have any concerns about it, I'll address it at that time."). We have no issue with the trial court's practical approach and reject the Doctors' assertions that Appellants waived their ability to pursue fee-shifting by not presenting evidence of the amount and reasonableness of their fees after the trial court suggested that they do so later if necessary. *See Avaya, Inc. v. Charter Commc'ns Hldg. Co., LLC*, 2016 WL 381261, at *3 (Del. Ch. Jan. 29, 2016) ("As a general matter, for involved, complicated litigation, waiting until resolution of the merits before shifting attorneys' fees has a common sense appeal.").

Superior Court erred by not dismissing Appellants' breach of contract claims under the Partnership Agreement due to lack of standing. Next, the Doctors contend that the trial court erred when it found that their conduct was the proximate cause of damage suffered by Appellants. Fourth, they contend that the trial court erred when it found that their conduct at the Foundation constituted a breach of the Employment Agreements and the Partnership Agreement. And finally, the Doctors assert that the Superior Court erred when it "reformed" the Partnership Agreement.

We address the cross-appeal arguments first, as they relate to the breach of contract determinations against the Doctors. Then we address the damages and fees issues raised by Appellants.

## II. STANDARD OF REVIEW

"We review questions of law and contractual interpretation . . . *de novo*."[50] This Court "reviews questions relating to standing under the *de novo* standard of review."[51]

"We review [the Superior Court's] damages award for abuse of discretion."[52] "We review for an abuse of discretion the trial court's assessment of attorney[s'] fees."[53] "While we review an award of attorneys' fees for abuse of discretion, we review the [trial court's] interpretation of a contractual fee-shifting provision *de novo*."[54] This Court will not disturb

---

[50] *Baldwin v. New Wood Res. LLC*, __ A.3d __, 2022 WL 3364169, at *13 (Del. Aug. 16, 2022).

[51] *Brookfield Asset Mgmt., Inc. v. Rosson*, 261 A.3d 1251, 1262 (Del. 2021) (citing *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1256 (Del. 2016)).

[52] *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 449 (Del. 2013).

[53] *Sternberg v. Nanticoke Mem'l Hosp., Inc.*, 62 A.3d 1212, 1220 (Del. 2013).

[54] *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 675 (Del. 2013) (internal citations omitted).

19

the trial court's "factual findings unless they are clearly erroneous."[55]

## III.     ANALYSIS

### A. The Cross-Appeal Arguments

#### 1.     Section 2707 Does Not Apply

The Doctors argue that the Superior Court erred in determining that Section 2707 does not apply to the contracts at issue. We disagree.

Section 2707 reads in relevant part:

> Any covenant not to compete provision of an employment, partnership or corporate agreement between and/or among physicians which restricts the right of a physician *to practice medicine* in a particular locale and/or for a defined period of time, upon the termination of the principal agreement of which the said provision is a part, shall be void[.][56]

The Superior Court dismissed the Doctors' Section 2707 argument at summary judgment, holding that "Section 2707 cannot be used to invalidate [their] non-competition agreements because the statute does not apply."[57]

"The 'most important consideration for a court in interpretating a statute is the words the General Assembly used in writing it.'"[58] As the Superior Court observed, the statute

---

[55] *Bäcker v. Palisades Growth Cap. II, L.P.*, 246 A.3d 81, 94 (Del. 2021) (internal quotations and citation omitted).

[56] 6 *Del. C.* § 2707 (emphasis added).

[57] *Bako Pathology*, 2019 WL 6896465, at *5.

[58] *Salzberg v. Sciabacucchi*, 227 A.3d 102, 113 (Del. 2020) (quoting *Boilermakers Loc. 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 950 (Del. Ch. 2013)). *See also Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323, 354 (Del. 2022) (quoting *Salzberg*, 227 A.3d at 113).

20

governs agreements not to compete "between and/or among physicians" which restrict "the right of a physician to practice medicine[.]"[59]   It held that:

> It is evident that the Employment Agreement, Merger Agreement, and Partnership Agreement are executed by Bakotic and Hackel on the one hand, arguably in their capacity as physicians.  However, the other parties that executed the documents are largely corporate entities unrelated to the practice of medicine.  Accordingly, the Court finds that Section 2707 is inapplicable because the agreements at issue cannot be considered "between and/or among physicians."[60]

On appeal, the Doctors contend that the trial court's holding is erroneous because it renders the term "among" superfluous.  An overview of the contracting parties to each agreement is a helpful starting point in addressing this contention.  The Employment Agreements are between the Doctors, on one side, and BPA Holding and Bakotic Associates, on the other.[61]   The following are parties to the Merger Agreement:  Bako Pathology Holdings Corp., Bako LP, BPA Merger Corp., BPA Holding, and — solely for certain provisions — Ampersand 2011 Limited Partnership.  Solely for the purposes of the Merger Non-Compete Provision, the Merger Non-Solicitation Provision, the amendment provision, and the miscellaneous provisions, the Merger Agreement is also executed individually by the Doctors and eight other individuals.[62]  The signatories to the Partnership Agreement are:  Bako Pathology GP LLC as general partner, and the following limited

---

[59] 6 *Del. C.* § 2707.

[60] *Bako Pathology*, 2019 WL 6896465, at *5 (quoting 6 *Del. C.* § 2707).

[61] A93 (Bakotic Employment Agreement); A101 (Hackel Employment Agreement).

[62] A114 (Merger Agreement Recital).

21

partners: the Doctors, Consonance Bako Holdings LP, Ampersand 2006 Limited Partnership, and Ampersand 2011 Limited Partnership, as well as five other individuals.[63]

We disagree with the Doctors that the Superior Court ignored the word "among." Clearly it did not. It simply concluded that the agreements are not "between and/or among physicians."[64] We agree with the trial court that the statute requires that "physicians," which could include multiple physicians, be counterparties.[65] The Doctors raise no challenge to the Superior Court's conclusion that the Merger Agreement and the Employment Agreements lack physician counterparties. Nor did they contest, in their briefing on appeal, the Superior Court's finding that "the other parties that executed the documents are largely corporate entities, unrelated to the practice of medicine."[66]

However, at oral argument before this Court, the Doctors argued for the first time that two of the limited partners who executed the Partnership Agreement were also

---

[63] B61 (Partnership Agreement Recital); B126–27 (Partnership Agreement Exhibit A).

[64] *See*, *B.F. Goodrich Co. v. Aircraft Braking Sys. Corp.*, 1994 WL 16019986, at *8 (D. Del. Nov. 10, 1994) ("In its definition of 'among,' the same dictionary states: 'Precise users of English use AMONG when more than two . . . things are involved . . . and use BETWEEN when only two . . . things are involved.").

[65] Also, "[t]he synopsis for the bill that became Section 2707 explains: 'Because patients establish relationships with their physicians and/or enter into courses of treatment with particular physicians, the patients should not be deprived of the services of the physician of their choice because of *an economic contract entered into between two physicians*.'" *Dunn v. FastMed Urgent Care, P.C.*, 2019 WL 4131010, at *14 (Del. Ch. Aug. 30, 2019) (quoting Del. S.B. 294 syn., 132nd Gen. Assem. (Del. 1983)) (emphasis added). "[T]he General Assembly adopted Section 2707 in furtherance of 'the importance of maintaining the continuity of care by protecting the physician-patient relationship.'" *Id.* (quoting *Total Care Physicians, P.A. v. O'Hara*, 2002 WL 31667901, at *6 (Del. Super. Oct. 29, 2002)). In *Dunn*, the restriction preventing the plaintiff from engaging in a competing executive position was held to not be violative of the statute because it did not "provoke Section 2707's protections of the physician-patient relationship" and the restriction was wholly unconnected to patient care. *Id*. at *15.

[66] *Bako Pathology*, 2019 WL 6896465, at *5.

22

physicians.[67]  Appellants responded that these limited partners were not counterparties to the Doctors, but instead were "on the same side" with the Doctors as counterparties to the partnership entity, Bako LP.[68]  Because the Doctors did not raise this argument in their briefing before this Court, it is waived.[69]  But even if we were to consider the Doctors' belated challenge, there is nothing in the record before this Court that suggests that the signatories were acting other than in their capacity as investors in Bako LP, as opposed to acting as "physicians" within the meaning of Section 2707.[70]

---

[67] *See* Oral Argument, at 31:37–59, https://livestream.com/delawaresupremecourt/events/10612702/videos/233007566 (Doctors' counsel noting that the presence of the two additional physicians triggers Section 2707's preclusive effect).  The Doctors did not advance this argument below in their briefing on § 2707 for summary judgment.

[68] *See id.* at 33:10–32 (Appellants' counsel noting that the other two physicians are on the same side of the Partnership Agreement as the Doctors).

The partnership itself is a counterparty to the Doctors and the other limited partners:  Bako LP is equally bound by the Partnership Agreement and may sue for rights under it, as occurred here.  *See* 6 *Del. C.* § 17-101(14) (a limited partnership is bound by a partnership agreement regardless of whether it executes the agreement).

[69] Del. Supr. Ct. R. 14(b)(vi)(A)(3) ("The merits of any argument that is not raised in the body of the opening brief shall be deemed waived and will not be considered by the Court on appeal.").

[70] We note, but do not address, the existence of other issues that raise questions as to Section 2707's applicability here.  The Superior Court observed that the court in *Dunn* suggested that Section 2707 was intended to protect the physician/patient relationship in Delaware and was not intended to manage the practice of physicians in other states.  *See, e.g.*, *Dunn*, 2019 WL 4131010, at *14 ("I conclude that the term 'practice medicine' in Section 2707 refers to a physician's provision of medical services or treatment to patients in Delaware.").  The Superior Court stated that "[a]t most, the Court would believe the prohibitions found in Section 2707 would only apply to the treatment or diagnosis of Delaware patients."  *Bako Pathology*, 2019 WL 6896465, at *5.  Otherwise, such a reading "would expand Section 2707 beyond that intended by the General Assembly."  *Id.*  Although the Doctors were licensed in various states, they were not licensed in Delaware.  *See* C44 (Dr. Hackel Dep. Tran. at 7:13–15); C63 (Dr. Bakotic Dep. Tran. at 17:4–6).

The record contains no evidence of the Doctors identifying or treating any patients in Delaware.  Other colorable arguments were raised below and/or on appeal calling into question the applicability of Section 2707.  For example, Appellants contended that Section 2707 requires "the termination of the principal agreement" in order for Section 2707 to apply.  Appellants' Reply Br.

Accordingly, we AFFIRM the trial court's determination.

### 2.    *Appellants Have Standing*

The Doctors' second contention on cross-appeal relates to the Partnership Agreement and an alleged lack of standing to sue for claims arising under it.  They assert that the Superior Court erred by not dismissing the claim for breach of the Partnership Non-Compete Provision due to lack of standing for all three Bako-affiliated entities.  They argue that Bakotic Associates lacks standing because it is neither a signatory to the Partnership Agreement nor a third-party beneficiary, although they later assert that Bakotic Associates is the only Defendant who could possibly have injury-in-fact standing to pursue the breach of contract claims in this case.  For BPA Holding, they contend that it has no customers and lacks an injury-in-fact to confer standing.  They make the same argument for Bako LP, namely, that it is too high up the corporate entity ladder to have suffered an injury.[71]

---

at 17.  But here, the partnership remains in force and, as the Superior Court noted, the Doctors are still limited partners in Bako LP.  *See Opinion*, at 35–36.  The Appellants also questioned whether the Doctors were treating patients and whether their professional activities fell within the ambit of Section 2707.  Appellants' Reply Br. at 16–17.

[71] At oral argument before this Court, the Doctors went a step beyond their briefing.  Counsel argued that *no* Bako-affiliated entity — Bakotic Associates, BPA Holding, or Bako LP — has standing to sue under the Partnership Agreement.  *See* Oral Argument, at 40:41–49, https://livestream.com/delawaresupremecourt/events/10612702/videos/233007566 (Doctors' Counsel:  "The result is that nobody has standing under the Partnership Agreement to pursue the injuries that were pursued in this case.").  When the Court asked if that argument "made any sense," the Doctors' counsel responded by diagnosing their position as a "cautionary tale from a contracting perspective."  *Id.* at 40:59–41:03.

We note the trial court's understandable frustration with the standing concerns raised well into the more advanced stages of this litigation.  *See* C137 (Oral Arg. Tran. at 36:9–16) ("[L]et's stop the gamesmanship, figure out who the parties are, who should be in the case, who has standing, and try the case . . . it's crazy that now in September when the court is going to trial in a few months I have people standing in front of me talking about standing.").  As this Court has stated, "[s]tanding is [] properly viewed as a threshold issue to ensure that the litigation before the tribunal is a case

24

Appellants raise several points in response. *First*, they assert that the Doctors waived their standing arguments with respect to Bakotic Associates. *Second*, Appellants assert that Bakotic Associates and BPA Holding are third-party beneficiaries under the Partnership Agreement. *Third*, Appellants assert that Bako LP did suffer an injury-in-fact sufficient to have standing.

We agree that the Doctors waived certain arguments by not fairly presenting them to the trial court or to this Court. For example, the Doctors raise two third-party beneficiary standing arguments for the first time on appeal. Of these, one was raised for the first time in the Doctors' reply brief on cross appeal, and another was raised for the first time at oral argument.[72] We decline to consider these two contract-based incorporation-by-reference arguments seemingly conjured up as pure afterthoughts.[73]

---

or controversy that is appropriate for the exercise of the court's judicial powers." *Brookfield Asset Mgmt., Inc. v. Rosson*, 261 A.3d 1251, 1262 (Del. 2021) (internal quotations and citation omitted).

[72] *See* Appellees' Reply Br. at 7–8. *See also Oral Argument*, at 38:50–59, https://livestream.com/delawaresupremecourt/events/10612702/videos/233007566.

[73] The Doctors argue that the Merger Agreement contains a provision disclaiming third-party beneficiaries and that the Merger Agreement is expressly incorporated into the Partnership Agreement. *See, e.g.*, A198 (Merger Agreement § 11.2), B74 (Partnership Agreement § 2.98), B113 (Partnership Agreement §12.8). However, they raised this argument for the first time in their reply brief on cross-appeal and did not raise it in their opening brief on appeal. *See* Appellees' Reply Br. at 7. As noted above, it is waived. *See* Del. Supr. Ct. R. 14(c)(i) (a party "shall not reserve material for reply brief which should have been included in a full and fair opening brief.").

Additionally, at oral argument before this Court, the Doctors raised — for the first time — that § 12.6 of the Partnership Agreement "rules out Bako Labs being an intended beneficiary." *See Oral Argument*, at 38:50–59, https://livestream.com/delawaresupremecourt/events/10612702/videos/233007566. Section 12.6 provides that "[t]he covenants and agreements" in the Partnership Agreement "inure to the benefit of, the heirs, executors, administrators, personal representatives, successors and permitted assigns of the respective parties hereto." B113 (Partnership Agreement § 12.6). Like their § 11.2 argument, this argument also has been waived.

25

However, we address the remaining aspects of the standing arguments raised by the Doctors that are, at least arguably, properly before this Court.[74] We turn first to the Doctors' argument that BPA Holding and Bakotic Associates lack standing because neither is a third-party beneficiary to the Partnership Agreement. This argument lacks merit. "A third-party beneficiary's rights are measured by the terms of the contract."[75] "As a general rule, only parties to a contract and intended third-party beneficiaries may enforce an agreement's provisions."[76] A third-party beneficiary is "an individual who is not a party to a contract [but] can nevertheless enforce it under certain circumstances."[77] As Delaware courts have held:

> Equally settled is the principle that a third person, who is, in effect, a stranger to the contract, may enforce a contractual promise in his own right and name if the contract has been made for his benefit. Essential to a third party's right of enforceability is the intention of the contracting parties to view that party as either a donee or a creditor beneficiary.[78]

---

[74] We note that the Doctors did not raise standing concerns regarding Bakotic Associates before trial and that Bakotic Associates was not yet a party to the action. It was only during oral argument on the motions for summary judgment that Bakotic Associates became a topic of discussion. At that oral argument, counsel for the Doctors stated they were "prepared to allow [Bakotic Associates] to be added to the extent that [Bakotic Associates] also has standing." C137 (Oral Arg. Tran. at 34:17–18). Following instruction from the trial court, the parties stipulated to adding Bakotic Associates as a defendant. No specific argument was made as to Bakotic Associates' lack of standing until the briefing before this Court, but because of the unique procedural circumstances, we consider this standing argument.

[75] *NAMA Hldgs., LLC v. Related World Mkt. Center, LLC*, 922 A.2d 417, 431 (Del. Ch. 2007).

[76] *Id.* at 434 (internal citation omitted). *See also Triple C Railcar Serv., Inc. v. City of Wilm.*, 630 A.2d 629, 633 (Del. 1993) ("It is axiomatic that either party to an agreement may enforce its terms for breach thereof.").

[77] 13 *Williston on Contracts* § 37:1 (4th ed.).

[78] *Triple C Railcar*, 630 A.2d at 633 (internal citations omitted).

"To qualify as a third party beneficiary of a contract, (i) the contracting parties must have intended that the third party beneficiary benefit from the contract, (ii) the benefit must have been intended as a gift or in satisfaction of a pre-existing obligation to that person, and (iii) the intent to benefit the third party must be a material part of the parties' purpose in entering into the contract."[79] "When a promised performance is rendered directly to the beneficiary, 'it is presumed that the contract was for the beneficiary's benefit.'"[80]

We agree with Appellants that BPA Holding and Bakotic Associates are third-party beneficiaries to the Partnership Agreement. Appellants focus on the Partnership Agreement's explicit reference to these entities as "Subsidiaries." The Partnership Agreement defines "Subsidiary" as:

> [A]ny corporation [or] limited liability company . . . of which more than 50% of the total voting power of the equity interests entitled . . . to vote in the election of the board of directors . . . thereof are at the time owned or control, directly or indirectly, by such Person[.][81]

Both BPA Holding and Bakotic Associates meet the definition of "Subsidiary." Bako LP owns BPA Holding and Bakotic Associates is an LLC whose sole member is BPA Holding.[82] Further, the Partnership Agreement's Non-Compete Provision expressly applies to Subsidiaries.

---

[79] *Madison Realty P'rs 7, LLC v. Ag ISA, LLC*, 2001 WL 406268, at *5 (Del. Ch. Apr. 17, 2001).

[80] *Comrie v. Enterasys Networks, Inc.*, 2004 WL 293337, at *3 (Del. Ch. Feb. 17, 2004) (quoting 13 *Williston on Contracts* § 37:7 (4th ed.)).

[81] B74 (Partnership Agreement § 2.103).

[82] *See supra* section I.A.

The Doctors fail to address the specific language in the Partnership Agreement that the provisions at issue here apply to Bako LP and its Subsidiaries.[83] Rather than addressing Appellants' various arguments directly, the Doctors rebut Appellants' third-party beneficiary standing arguments by raising the entirely new arguments which we have deemed waived.[84] We are satisfied, based upon the record and on the lack of any focused joining of the issues regarding the entities' third-party beneficiary standing, that BPA Holding and Bakotic Associates have standing to assert claims under the Partnership Agreement as third-party beneficiaries.

The Doctors also contend in their opening brief on appeal that Bako LP did not suffer an injury-in-fact. Delaware law is clear that "a party to a commercial contract who sues to enforce its contractual rights can bring a direct contract action under Delaware law."[85] That is what Bako LP did. Bako LP asserted counterclaims — brought under contracts it signed — against the Doctors, who remain limited partners under the partnership, alleging that the Doctors violated their contracts and competed with Bako.[86] Thus, we reject the Doctors' challenges to Bako LP's standing, and we agree with the

---

[83] *See* B89 (Partnership Agreement § 6.5.1); B93 (Partnership Agreement § 6.8).

[84] *See supra* n.73. We sympathize with the trial court's understandable frustration with this scattershot approach to what should be a threshold issue.

[85] *NAF Hldgs., LLC v. Li & Fung (Trading) Ltd.*, 118 A.3d 175, 176 (Del. 2015) (holding that where the plaintiff — a stockholder of the third-party beneficiary — has secured a contractual commitment of the defendant counterparty to render a benefit to that third-party, and the counterparty defendant breaches that commitment, the promissee-plaintiff may bring a direct suit against the promisor for damages suffered by the plaintiff resulting from that breach, notwithstanding that the promisee-plaintiff's loss derives indirectly from the loss suffered by the third-party beneficiary corporation.).

[86] A267–68 (Def. Ans. & Counterclaims ¶¶ 42–51).

28

Superior Court, as explained below, that those counterclaims are meritorious.[87]

### 3. *The Doctors Breached the Employment and Partnership Agreements and Proximately Caused Damage*

The Doctors' third and fourth arguments on cross-appeal can be combined. They contend that the Superior Court erred when it found that their participation in conferences (including serving as sponsors and lecturers) breached the Employment Agreements and Partnership Agreement and that such breaches proximately caused damage to Appellants. We reject their arguments and affirm the trial court's ruling on both issues.

The Doctors' arguments here strike at the heart of the entire dispute: whether their actions violated certain restrictive covenants in the various contracts. The Superior Court found that they did. We agree.

To start, the Doctors argue that the Employee Non-Compete Provisions do not bar them from sponsoring and lecturing at podiatric medical conferences. They contend that the trial court improperly determined that the Employee Non-Compete Provisions cover "not just commercial benefits, but apparently a whole galaxy of non-commercial benefits like positive feelings and subjective increases in medical knowledge."[88] An examination of the facts found below is helpful.

The Superior Court found "that a key function of Dr. Bakotic's role at Bako, and critical to the company's marketing strategy and success, was to sponsor podiatric

---

[87] *See Opinion*, at 21–26, 31–39.

[88] Appellees' Ans. Br. at 54.

29

conferences and provide lectures at the events to educate attendees."[89]  "It was a critical piece of the strategy developed by Dr. Bakotic to enhance Bako's presence in the market and upon which the business gained its success."[90]  The trial court found that, "[t]here is no doubt that Dr. Bakotic intended to duplicate this success at the Rhett entities using the same marketing strategy and to replace Bako as the leader in this industry."[91]  It further found that "[a]s he once did at Bako, Dr. Bakotic selected the conferences the Rhett Foundation would sponsor and he, along with Dr. Hackel, provided lectures at those events, which were attended by and for the benefit of Bako's client base."[92]  It was "the duplication of this marketing process, to the detriment of Bako, that was prohibited under the [Employment] Non-Compete Provision[s]."[93]

In the face of these factual findings, the Doctors strenuously argue that the Employment Agreements' definition of "business" dictates that activities such as sponsoring and providing lectures fall outside the scope of the prohibited activities.[94]  But neither the Employment Non-Compete Provisions nor the Employment Agreements define

---

[89] *Opinion*, at 23.

[90] *Id.*

[91] *Id*.

[92] *Id.* at 24.

[93] *Id*. at 23.

[94] Appellees' Ans. Br. at 55.  The Doctors, though, merely reference a recital in the Employment Agreements, which states that the "Company is a provider of anatomic pathology testing services[.]"   A93 (Bakotic Employment Agreement recital); A101 (Hackel Employment Agreement recital).   The Employment Agreements do not contain a "definitions" section. "Company" is defined collectively in the initial paragraph as "BPA Holding Corp., on behalf of itself and its wholly-owned subsidiary, Bakotic Pathology Associates, LLC[.]"  *Id*.

"business."[95]  In addition, the word "business" does not appear in the Employment Non-Compete Provisions.

However, the Employment Non-Compete Provisions do contain a clear statement that the Doctors may "not perform the *same or similar duties* that [they] performed for the Company[.]"[96]  As the trial court found, the Doctors routinely sponsored and gave lectures on podiatry topics at medical conferences which the court found helped "the business gain[] its success."[97]  The Doctors engaged in these activities while employed at Bako, and they continued to do so after they started the Foundation.  Based on the facts as found by the trial court — which are not clearly erroneous — and the clear contractual language in the Employment Agreements, we affirm the trial court's ruling that the Doctors violated the Employment Non-Compete Provisions.

Regarding the Partnership Non-Compete Provision, the Doctors contend that the Merger Agreement is expressly incorporated into the Partnership Agreement and that the meaning of "business" within the Partnership Non-Compete Provision is governed by the Merger Agreement's definition of "business."[98]  We note that § 12.8 of the Partnership Agreement, defining "Entire Agreement," provides that the Partnership Agreement "and the Related Agreements constitute the entire agreement[.]"[99]  Section 2.98 of the

---

[95] A93 (Bakotic Employment Agreement); A101 (Hackel Employment Agreement).

[96] A93 (Bakotic Employment Agreement § 1) (emphasis added); A101 (Hackel Employment Agreement § 1) (emphasis added).

[97] *Opinion*, at 23.

[98] Appellees' Reply Br. at 13.

[99] B113 (Partnership Agreement § 12.8).

31

Partnership Agreement defines "Related Agreements" to include the Merger Agreement.[100] The Merger Agreement defines "business" as "the business of providing anatomic pathology, proprietary molecular microbiology and neurology testing services and physician dispensed therapeutics as currently conducted or specifically planned to be conducted by the Company and its Subsidiaries on the date hereof."[101] The Doctors contend that this definition precludes a finding that their activities on behalf of the Foundation — lecturing and sponsoring conferences — violated the Partnership Non-Compete Provision.

We disagree. The fact that the Partnership Agreement provides that the Merger Agreement is part of the "Entire Agreement" does not mean that the Merger Agreement's narrower definition of "business" overrides language in the Partnership Non-Compete Provision and, specifically, its broader restriction on "business interests and activities in direct competition with the Partnership or any of its Subsidiaries[.]"[102] Rather, the Superior Court acknowledged the differences in the provisions and read them in harmony, giving

---

[100] B74 (Partnership Agreement § 2.98).

[101] A181 (Merger Agreement § 10.1). The Merger Non-Compete Provision and the Merger Non-Solicitation Provision, both found in § 5.11 of the Merger Agreement, restrict "Competing Business" activities. A163 (Merger Agreement § 5.11(a)). As the Superior Court observed, "the Merger Agreement defines Competing Business as '*any business in which the Company or any of its Subsidiaries is engaged*, or has specific plans (as evidenced by documentation of the Company) to become engaged.'" *Opinion*, at 27 (emphasis in original).

[102] B89 (Partnership Agreement § 6.5.1). We note that § 10.1 of the Merger Agreement — entitled "Definitions" — provides that "the following terms [including 'Business'] when used *in this Agreement* shall have the respective meanings set forth below[.]" A180 (Merger Agreement § 10.1) (emphasis added). "Agreement" is defined as the Merger Agreement. *See id.*

32

effect to both.[103]  It expressly found that the Merger Non-Compete Provision was not violated "[s]ince there [was] no competing lab created by Plaintiffs[.]"[104]

But the court also gave effect to the specific, broader language in the Partnership Non-Compete Provision.  As the Superior Court found:

> Drs. Bakotic and Hackel did engage in business activities and held business interests that competed with Bako's interests through the Rhett brand, and therefore they breached the Non-Competition provision of the Partnership Agreement.  The Court finds that the activities performed by Drs. Bakotic and Hackel in the name of the Rhett entities were detrimental to the historical marketing practices that Bako relied upon and that was key to their success. There is no doubt that [the Doctors] intended to conduct their new business activities with the intent of undermining the Bako brand.  That is simply not allowed under the Partnership Agreement.[105]

The trial court found that the Doctors hired several employees to work for Rhett Diagnostics, including several who were previously Bako employees, and that they purchased lab equipment.   Although there is no indication that the Rhett lab ever became operational, the record does support the trial court's conclusions, following a seven-day bench trial, that the Doctors engaged in "business interests and activities in direct competition with the Partnership or any of its Subsidiaries."[106]  We find no error in this aspect of the trial court's ruling.

---

[103] *See Opinion*, at 26–27, 34–36.  The Doctors agree that the two agreements should be read together.  *See* Appellees' Reply Br. at 16.

[104] *Opinion*, at 30.

[105] *Id.* at 36.

[106] B89 (Partnership Agreement § 6.5.1); *see also Opinion* at 33–36.  The trial court was not persuaded that the Doctors were merely focused on educating the podiatric community.  Rather, the court observed that "[o]ne does not buy hundreds of thousands of dollars of equipment and hire employees to simply sit for two years waiting for the Non-Compete time frame to end." *Opinion*, at 21.

In addition to challenging the findings that the Doctors breached the Employment Agreements and Partnership Agreement, the Doctors also contend that the trial court erred when it found that such activities "proximately caused" Appellants damage. The Superior Court found "no doubt that [the Doctors'] violation of their contractual Non-Competition restrictions caused Bako to lose business. In fact, there is an identifiable group of doctors who clearly decided to stop using Bako or to reduce their volume of business because of the conduct of [the Doctors]."[107] In particular, the Superior Court noted that a list in the Appellants' expert report "identifies those individuals who Bako's sales representatives had reported reduced their orders to Bako because of the perceived mistreatment of Drs. Bakotic and Hackel."[108] The trial court then determined the amount of damages to award Appellants for the breaches suffered.

"On appeal, this Court reviews the issue of proximate cause for clear error, as the question 'is ordinarily a question of fact to be determined by the trier of fact.'"[109] We find no error in the Superior Court's determination that the Doctors' conduct proximately caused damage to Appellants. "Under Delaware law, a proximate cause is one 'which in natural and continuous sequence, unbroken by any efficient intervening cause, produces

---

[107] *Opinion*, at 46.

[108] *Id. See also* A483–86 (Mark J. Hosfield Expert Report at Appendix D).

[109] *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 864 (Del. 2015) (quoting *Duphily v. Del. Elec. Co-op., Inc.*, 662 A.2d 821, 830 (Del. 1995)). *See also Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1128 (Del. 2015) (noting that this Court "will uphold [a trial court's] factual findings unless they are clearly erroneous.") (internal citation omitted).

the injury and without which the result would not have occurred.'"[110]  The trial court's determination of proximate cause was based on a careful examination of the record evidence.

### 4.    *The Partnership Agreement was not "Reformed"*

The Doctors' final argument on cross-appeal is that "the Superior Court erred when it removed the limiting term 'business' when reforming the Partnership Non-Compete" and "determined what the parties intended when they executed such provision."[111]  They argue that the Partnership Non-Compete Provision "is unlimited in territory and also unlimited in the type of conduct it prohibits[,]" which, they contend, renders it "void as a matter of law."[112]

> In addressing this argument, the trial court found that:

> Although [the Doctors] argue that the Non-Competition provision of the Partnership Agreement is unlimited in scope, territory, and duration, the Court disagrees.  While Drs. Bakotic and Hackel remain limited partners, the restrictions on competition remain.  However, if they choose to withdraw from their position as limited partners, they have the power to end the restrictive covenants immediately.[113]

It determined that the Partnership Non-Compete Provision "was intended to prevent [the Doctors] from engaging in similar and competitive activity that would be detrimental to

---

[110] *RBC Cap. Mkts., LLC*, 129 A.3d at 864 (quoting *Russell v. K-Mart Corp.*, 761 A.2d 1, 5 (Del. 2000)).

[111] Appellees' Ans. Br. at 61.

[112] *Id.* at 62.

[113] *Opinion*, at 36.

35

the partnership."[114] The trial court concluded that the Doctors did breach the Partnership Agreement through their actions with the Rhett entities.

We do not agree that the Superior Court "reformed" the contract by removing the word "business" from the Partnership Non-Compete Provision. The Doctors' argument is not a fair reading of the trial court's opinion. The trial court interpreted the term "business" and the phrase "business interests and activities" based upon the evidence, including the intentions of the parties to the Partnership Agreement. For example, the court concluded that

> The Court simply cannot accept or condone a provision that in essence prohibits engaging in any activity regardless of how remote or unrelated to the partnership's business. The Court is equally convinced this was never the intent of those who were participants in the Partnership Agreement. There is no question that provision was intended to prevent [the Doctors] from engaging in similar and competitive activity that would be detrimental to the Partnership. However, the Court finds Drs. Bakotic and Hackel did engage in business activities and held business interests that competed with Bako's interests through the Rhett brand, and therefore they breached the Non-Competition provision of the Partnership Agreement. The Court finds that the activities performed by Drs. Bakotic and Hackel in the name of the Rhett entities were detrimental to the historical marketing practices that Bako relied upon and that was key to their success.[115]

As we have discussed above, the trial court correctly found that the Doctors' conduct violated the Partnership Non-Compete Provision's express terms. Accordingly, we reject their final argument on cross-appeal.

---

[114] *Id.* at 35.

[115] *Opinion*, at 35–36.

36

## B. The Damages Calculation

Having found no merit in any of the Doctors' contentions on cross-appeal, we now turn to the arguments presented by Appellants. Appellants claim that the trial court's damages analysis was flawed in two ways. First, they contend that the court abused its discretion by arbitrarily applying a 1.5% growth rate without explaining how it derived that growth rate. Second, they assert that even if the growth rate were found to be appropriate, the court incorrectly applied the two-step damages formula that the parties employed in this case.

Appellants' expert, Mark J. Hosfield ("Hosfield"), "opined that Bako suffered lost profits of $8,273,121 from January 2018 to February 2019 and a loss in business value of $65,980,243 as of March 2019."[116] We note that both the Doctors and the Appellants agreed with the basic framework of Hosfield's two-step analysis to calculate damages for lost profits.[117] Hosfield's two-step analysis involved calculating the lost unit sales because of the Doctors' conduct and then, secondly, determining the lost profits resulting from those lost unit sales. To determine Bako's lost unit sales, Hosfield first calculated the unit sales Bako expected to generate in the relevant period. The lost unit sales number was derived by applying an expected growth rate to Bako's past sales. After calculating Bako's expected sales units (which Hosfield referred to as the "but for" units), he then subtracted Bako's actual sales for the relevant period from the "but for" unit sales.

---

[116] *Id.* at 44 (citing A381 (Mark J. Hosfield Expert Report at 34)).

[117] *See Oral Argument*, at 6:55–7:23, 26:24–50, https://livestream.com/delawaresupremecourt/events/10612702/videos/233007566.

37

As for the second step in the analysis, in order to calculate Bako's lost profits arising from these "but for" unit sales, Hosfield multiplied the amount of lost "but for" unit sales by the actual price of the units for that given month. He then subtracted costs and bad debt expenses. He concluded that Bako's lost profits from those lost units totaled $8,273,121.

We address the growth rate challenge first. Appellants contend that the trial court abused its discretion when the court selected a growth rate of 1.5% to calculate Bako's lost profits and failed to provide any calculation or record support for its selection.[118]

The trial court concluded that Hosfield's growth rate of 9.4 percent and 8.9 percent was "inappropriate."[119] It then stated that "the fact that Drs. Bakotic and Hackel were no longer employed by Bako would have greatly reduced any projected growth rate."[120] Thus, the court found:

> [A] growth rate of around 9% suggested by Mr. Hosfield is unrealistic and would have caused the "but for" figure to be inflated and unreliable. Since Mr. Hosfield's subsequent projections as to the lost profits and loss of business value rely upon the acceptance of his growth rate, they will not be adopted by the Court.[121]

After rejecting Hosfield's growth rate, the court stated:

> [I] will accept Mr. Hosfield's expert opinion that *some growth did occur* during that timeframe. Therefore, based on the testimony of what was occurring in the industry and the turbulent situation at Bako, the Court *has decided to apply a growth rate of 1.5% to the "but for" figure* calculated by Mr. Hosfield. This will result in a damages figure of $1,433,814.00 in 2018

---

[118] The Doctors raise this same challenge, but they argue that Appellants submitted no competent evidence of damages. *See* Appellees' Ans. Br. at 18–19.

[119] *Opinion*, at 47–48.

[120] *Id.* at 48.

[121] *Id.*

and $306,440.00 in 2019. Therefore, the Court finds the contractual breaches by [the Doctors] resulted in a damage award of $1,740,254.00 for lost business.[122]

Appellants contend that the Superior Court arbitrarily chose the 1.5% growth rate. They point out that if the Superior Court took issue with the higher growth rates offered by Hosfield, Hosfield also provided alternative growth rates of 4.7% in 2018 and 4.45% in 2019.[123] Appellants also assert that the expert called at trial by the Doctors, Robert J. Taylor, IV, testified that he used a 3% growth rate.[124]

We have explained that "[i]n making a decision on damages, or any other matter, the trial court must set forth its reasons. This provides the parties with a record basis to challenge the decision. It also enables a reviewing court to properly discharge its appellate function."[125] Here, the Superior Court did offer some reasoning behind its view that the Appellants' proffered growth rate was too high. The court reasoned that "the fact that Drs. Bakotic and Hackel were no longer employed by Bako would have greatly reduced any

---

[122] *Id.* at 49 (emphases added).

[123] *See* A844 (Mark J. Hosfield Trial Test. at 54:11–17); A432–35 (Mark J. Hosfield Expert Rep. at Exhibit 7).

[124] Appellants' Op. Br. at 25 n.5 (citing A795 (Robert J. Taylor, IV Trial Test. at 37:9–15)).

[125] *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1251 (Del. 2012). In *Americas Mining Corporation*, for example, we affirmed a damages award that was "the product of a logical deductive reasoning process." *Id.* at 1249. Although the parties here rely, in part, on appraisal cases in their briefing, we note that a damages calculation in a contract dispute differs from a trial court's exercise of determining fair value in an appraisal action. *Cf. DFC Global Corp. v. Muirfield Value P'rs, L.P.*, 172 A.3d 346 (Del. 2017); *Dell, Inc. v. Magnetar Global Event Driven Master Fund Ltd.*, 177 A.3d 1 (Del. 2017). But even in a contractual dispute, the trial court must sufficiently explain its analysis, so that there can be effective appellate review. *See Theriault*, 51 A.3d at 1251.

39

projected growth rate."[126]  The court was also persuaded that "Bako had reached a market saturation that would hamper any additional growth [and] that many of the podiatry services were being insourced by the doctors, and hospitals, with their own labs, and were beginning to purchase podiatric practices."[127]

Accordingly, the court "decided to apply a growth rate of 1.5%[.]"[128]  It properly weighed the testimony offered by Hosfield and examined the calculations in Hosfield's report.  We do not agree with the Appellants that the chosen growth rate of 1.5% was not grounded in the record.  Although its explanation for choosing that growth rate could have been more fulsome, the trial court did not abuse its discretion in selecting the 1.5% growth rate, and we, thus, affirm that aspect of the court's ruling.

We turn next to Appellants' contention that the court did not properly apply that growth rate in the lost units analysis.  Appellants assert, and it does indeed appear, based upon the Superior Court's explanation in its opinion, that the court incorrectly applied the 1.5% growth rate to the "but for" figure calculated by Hosfield.  In the first step, the growth rate should have been applied to Bako's historical sales data to determine Bako's expected or "but for" sales.  Actual sales are then subtracted from the "but for" sales to derive the lost unit sales.  However, the court stated that it "has decided to apply a growth rate of

---

[126] *Opinion*, at 48.

[127] *Id*.

[128] *Id.* at 49.

40

1.5% to the 'but for' figure calculated by Mr. Hosfield."[129]  But the growth rate should not have been applied to the "but for" sales.

Appellants argue that because the Superior Court did not explain and set forth its calculations, it is unclear how it arrived at its awarded damages amount.  We, too, cannot determine for certain whether the court simply misstated what it did or whether it misapplied the damages formula in performing its actual calculations.[130]  Accordingly, we remand this issue to the trial court for clarification and to make any necessary revisions.

Appellants also argue that the trial court erred in its calculation of units lost by misinterpreting Hosfield's calculation of units in Schedules 2.a, 2.b, and 2.c of his report.  They assert that these schedules contain the monthly units bought during the relevant period for three small subsets of customers who ceased or reduced their business with Bako.  They further assert that the Superior Court concluded that these schedules contain 52,419 units that were affected by the Doctors' misconduct.  They claim the court erred by stating that the 52,419 units represent the total actual units sold to this subset of customers during the relevant time, not the number of units lost due to the Doctors' misconduct.

Based upon the record before this Court, it is unclear to us whether the disputed figure of 52,419 units constitutes a subset of units sold or the actual number of units lost. We direct the trial court on remand to address and clarify this additional point and to set

---

[129] *Id.*

[130] We are unaided by the Doctors' briefing, which did not respond to Appellants' arguments regarding these alleged miscalculations.

forth the basis for its damages calculations. We anticipate that any further submissions on these damages issues would be based upon the evidence already submitted.[131]

As for the Appellants' contention that the trial court erred in not awarding damages for lost business value, we find no error. The trial court found that Appellants "simply have not met their burden to establish a sufficient causal connection between the actual conduct of [the Doctors] and the proposed nearly 66-million-dollar loss in business value."[132] The court found that "[t]he proposed loss is simply a theoretical one without support as to what actually occurred."[133] We find no abuse of discretion with that determination.

## C. *Failure to Award Attorneys' Fees for Breach of the Employment Agreements was Error*

Appellants' second set of issues concerns whether the Superior Court abused its discretion when it declined to award "attorneys' fees to Bako consistent with the fee-shifting provisions in the Employment and Partnership Agreements[.]"[134] The Doctors argue that the trial court correctly declined to award attorneys' fees because neither side prevailed at trial.

---

[131] We note that the Superior Court did not allocate its damages award among the various corporate entities. However, it appears that counsel did not seek such apportionment. *See* Oral Argument, at 12:38–13:51, https://livestream.com/delawaresupremecourt/events/10612702/videos/233007566.

[132] *Opinion*, at 50.

[133] *Id.*

[134] Appellants' Op. Br. at 35. Appellants contend that their attorneys' fees "totaled approximately $2.3 million." *Id.* (citing A701 (Daniel Spragle Trial Test. at 148:18–20)).

Where "an award [for attorneys' fees] is legally permissible, [] the determination of the appropriate amount is a classic matter for the trial court's discretion."[135] This Court "conduct[s] a highly deferential abuse-of-discretion review by keeping in mind the non-exhaustive factors of Rule 1.5(a) of the Delaware Lawyer's Rules of Professional Conduct."[136] "[A]lthough we review an award of attorneys' fees for abuse of discretion, we consider the [trial] court's interpretation of relevant [] contractual provisions *de novo*."[137]

"Delaware generally follows the American Rule, under which litigants are responsible for their own attorneys' fees, regardless of the outcome of the lawsuit."[138] One exception to the American Rule "is found in contract litigation that involves a fee shifting provision."[139] "In contract litigation, where the contract contains a fee-shifting provision, we will enforce that provision."[140]

---

[135] *TransPerfect Global, Inc. v. Pincus*, 278 A.3d 630, 653 (Del. 2022) (internal citation omitted).

[136] *Id. See also Mahani v. Edix Media Grp., Inc.*, 935 A.2d 242, 245–6 (Del. 2007). The Rule 1.5(a) factors are "(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent." *Id.* at 246. Trial court judges in this State are directed by case law "to consider [these] factors" when "assess[ing] a fee's reasonableness[.]" *Id.* at 245–6.

[137] *TransPerfect*, 278 A.3d at 656 (internal citation omitted).

[138] *Alaska Elec. Pension Fund v. Brown*, 988 A.2d 412, 417 (Del. 2007) (internal citation omitted). *See also Reserves Dev. LLC v. Crystal Props., LLC*, 986 A.2d 362, 369 (Del. 2009).

[139] *Mahani*, 935 A.2d at 245.

[140] *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 352 (Del. 2013) (internal citation omitted).

Here, the trial court declined to award attorneys' fees despite the fee-shifting provisions in the Employment Agreements and the Partnership Agreement. At the outset of its fees discussion, the trial court stated:

> While the Court will explain its reasoning below, it does not believe the conduct of the parties justifies such relief. Both failed to exercise good business judgment and have used the justice system to obtain some form of revenge. For the Court to deviate from the American Rule would only give some degree of countenance to this litigation. Justice demands that both parties pay for litigation that should have ended years ago.[141]

The court then examined the fee-shifting provisions in the Employment Agreements and the Partnership Agreement. Both the Employment Fee-Shifting Provisions and the Partnership Fee-Shifting Provision contain the phrase "prevailing party" as a precondition to shifting fees.[142] However, the provisions differ in a significant respect. The Partnership Fee-Shifting Provision provides that fees are to be shifted to the prevailing party in "*any dispute between the parties hereto*[.]"[143] Further, the Partnership Agreement defines "prevailing party" to mean "the party who is determined *in the proceeding* to have prevailed or who prevails by dismissal, default or otherwise."[144] However, the Employment Fee-Shifting Provisions provide that fees are to be shifted to "the prevailing

---

[141] *Opinion*, at 51.

[142] *See* A97 (Bakotic Employment Agreement § 8); A105 (Hackel Employment Agreement § 8); B113–14 (Partnership Agreement § 12.12).

[143] B113 (Partnership Agreement § 12.12) (emphasis added).

[144] B114 (Partnership Agreement § 12.12) (emphasis added).

44

party *in any legal proceeding* to construe, apply, interpret, enforce or defend any of the Company's rights *in this Agreement*[.]"[145]

Both the Employment Fee-Shifting Provisions and the Partnership Fee-Shifting Provision are contractual provisions and, as such, require this Court's traditional approach to contract interpretation. "We interpret clear and unambiguous contract terms according to their plain meaning."[146] "Prevailing party" is a term of art that the parties bargained for in the contracts. "Having chosen the common term 'prevailing party,' the parties can be presumed to have intended that that term would be applied by the court as it has traditionally done so."[147] "That traditional application is an all-or-nothing approach involving an inquiry into which party predominated in the litigation[,]" as opposed to a claim-by-claim or other partial basis approach.[148]

Our trial courts have frequently dealt with such "prevailing party" clauses in contracts. In *Brandin v. Gottlieb*, for example, the Court of Chancery determined that a "prevailing party" clause awards fees to a party "who has prevailed on most of her

[145] A97 (Bakotic Employment Agreement § 8) (emphases added); A105 (Hackel Employment Agreement § 8) (emphases added).

[146] *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 683 (Del. 2013) (internal citation omitted).

[147] *Brandin v. Gottlieb*, 2000 WL 1005954, at *28 (Del. Ch. July 13, 2000).

[148] *Comrie v. Enterasys Networks, Inc.*, 2004 WL 936505, at *2 (Del. Ch. Apr. 27, 2004), *aff'd* 864 A.2d 929 (Del. 2004) (TABLE). *See also Aloha Power Co., LLC v. Regenesis Power, LLC*, 2017 WL 6550429, at *5 (Del. Ch. Dec. 22, 2017) ("'Absent any qualifying language that fees are to be award claim-by-claim or on some other partial basis, a contractual provision entitling the prevailing party to fees will usually be applied in an all-or nothing manner.'") (quoting *W. Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*, 2009 WL 458779, at *8 (Del. Ch. Feb. 23, 2009)).

claims[.]"[149]   There, one party had "succeeded on a variety of important claims, having

prevailed in her previous summary judgment motion [and then] having won most of the

claims she pressed at trial."[150]   The party who was deemed the "prevailing party" in

*Gottlieb* did not win on every issue — and yet the court still shifted fees.[151]   In *2009 Caiola*

*Family Trust v. PWA, LLC*, the Court of Chancery articulated that "[t]o achieve

predominance, a litigant should prevail on the case's 'chief issue.'"[152]

With that backdrop, our analysis turns to the trial court's application of the fee-

shifting provisions.   The differences in the fee-shifting provisions present some novel

issues.   Unlike the typical case where there are multiple claims and the court must

determine which party prevailed — often with both sides having won on some and lost on

some — this case involves not only multiple claims, but also different agreements

containing different fee-shifting provisions.   As noted above, the Partnership Agreement

speaks of the "prevailing party" in terms of the overall dispute, whereas the Employment

Agreements speak to the "prevailing party" in terms of success on claims involving rights

under those specific Employment Agreements.   We think this difference is important here.

However, the trial court's analysis did not consider these differences in the

contracts.   Instead, it looked at the "prevailing party" language more globally, holding that:

---

[149] *Gottlieb*, 2000 WL 1005954, at *27.

[150] *Id.*

[151] *See id.* (noting that the other party prevailed on a material breach claim, "which involved a good deal of litigation effort on both sides.").

[152] 2015 WL 6007596, at *33 (Del. Ch. Oct. 14, 2015) (quoting *W. Willow-Bay Court*, 2009 WL 458779, at *9).

The fee-shifting language chosen by the parties requires the Court to perform the traditional analysis and look to the overall substance of the litigation. Both the [Doctors] and the [Appellants] have won some claims and lost on others. However, after years of excessive litigation, that culminated in a seven-day trial, the parties recovered much less than sought. Under those circumstances, the Court has discretion to find that neither party is a "prevailing party."[153]

The Superior Court concluded that there were "two chief issues present at trial[.]"[154] These "boil[ed] down to five breach of contract claims and two tortious interference claims."[155] The Superior Court noted that the Doctors won "on the two tortious interference claims and one of the contract claims[,] [w]hile [the Appellants] prevailed on the four-remaining breach of contract claims only."[156] By ignoring the different language in the Employment Fee-Shifting Provisions, the trial court's analysis is only partly correct.

Under the Partnership Fee-Shifting Provision, the prevailing party must prevail in the overall dispute itself. The trial court's focus on the overall dispute and its conclusion that there was no prevailing party in the overall dispute here is not an abuse of discretion. Thus, we find no error in the trial court's decision to not award attorneys' fees under the Partnership Agreement.

However, the narrower language in the Employment Fee-Shifting Provisions focuses on vindicating rights under those specific contracts. With regard to the claims raised under the Employment Agreements, the trial court ruled for Appellants on all claims:

---

[153] *Opinion*, at 53.

[154] *Id.*

[155] *Id.*

[156] *Id.* The one breach of contract claim that the Doctors won on was asserted under the Merger Agreement, which does not contain a fee-shifting provision.

the Doctors breached the Employment Non-Compete Provisions and the Employment Non-Use Provisions.[157] Thus, the Appellants are the clear "prevailing party" on the claims raised in connection with the Employment Agreements.[158]

We reject the Doctors' assertions that their win on the tortious interference claims undercuts this conclusion. The tortious interference claims asserted by Appellants against Dr. Bakotic as compulsory counterclaims were based upon other agreements with third-parties, not upon the Employment Agreements.[159] The Doctors cite no case holding that success on a tortious interference claim not based on the agreement containing the fee-shifting provision negates fee-shifting where a party prevails on all claims based upon that agreement and where the agreement's "prevailing party" language focuses on claims involving rights under that agreement. Accordingly, we conclude that the Superior Court erred by not awarding attorneys' fees in connection with the litigation of the claims arising under the Employment Agreements. Accordingly, we REVERSE and REMAND for further proceedings consistent with this Opinion.

### IV. CONCLUSION

In sum and based on the foregoing, we reject all claims raised by the Doctors in their cross-appeal and AFFIRM the Superior Court's decisions on those claims. We

---

[157] *Id.* at 54.

[158] *See AFH Hldg. & Advisory, LLC v. Emmaus Life Scis., Inc.*, 2014 WL 1760935, at *3 (Del. Super. Apr. 16, 2014) (awarding attorneys' fees under fee-shifting provision where party won on the breach of contract issues).

[159] Appellants asserted "that Dr. Bakotic tortiously interfered with two contracts: (1) the Podiatric Medical Director Services Agreement between Bako and Dr. Bryan Markinson; and (2) the Medical Director Services Agreement between Bako and the AFCG." *Opinion*, at 18. Neither contract is at issue on appeal.

REMAND to the Superior Court the two aspects of the lost profits damages calculations for clarification and revision, if needed, consistent with this Opinion. Finally, we REVERSE the Superior Court's decision declining to award attorneys' fees under the Employment Agreements and REMAND for additional development of the record on that issue consistent with this Opinion.